**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MICHAEL SCIORTINO and JOSH SAWYER, on behalf of themselves and all others similarly situated, | CASE NO.: 1:25-CV-03126-HG |
| Plaintiffs, | Hon. Judge Hector Gonzalez |
| v. | |
| DRINK LMNT, Inc., | |
| Defendant. | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................... 1

II.     FACTUAL BACKGROUND .................................................................................... 2

      A.      LMNT Targets Health-Seeking Consumers with a Nutrition Supplement that Purportedly Consists Primarily of Natural Electrolytes.......................................... 2

      B.      LMNT Contains a Substantial Amount of Maltodextrin, a Highly Processed Food Additive.................................................................................................................... 3

      C.      Plaintiffs and Other LMNT Customers Paid More for the Product Because of LMNT's False and Misleading Representations....................................................... 5

III.    REQUEST FOR JUDICIAL NOTICE ............................................................... 6

IV.     MOTION TO DISMISS STANDARD.................................................................. 7

V.      ARGUMENT ........................................................................................................... 8

      A.      Plaintiffs' Claims are Not Preempted Because Plaintiffs Do Not Seek to Impose Requirements that Conflict with Federal Law. ....................................................... 8

      B.      Plaintiffs Adequately Allege That Reasonable Consumers Could be Misled by LMNT's Misrepresentations ................................................................................ 10

            1.      LMNT's Misrepresentations Misled Reasonable Consumers .................. 14

            2.      LMNT's Misrepresentations are Not Mere Puffery................................. 19

            3.      Plaintiffs Adequately Allege An Injury Caused by LMNT's Deceptive Marketing. ................................................................................................ 22

VI.     CONCLUSION....................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ackerman v. Coco-Cola Co.*,
    2010 WL 2925944 (E.D.N.Y. July 21, 2010)...................................................................... 23

*In re Frito-Lay N. Am., Inc. All Nat. Litig.*,
    2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) .................................................................. 17

*Kennedy v. Mondelez Global LLC*,
    WL 4006197 (E.D.N.Y. July 10, 2020)............................................................................. 15

*Walcoff v. Innofoods USA, Inc.*,
    2023 WL 3262940 (S.D. Cal. May 4, 2023) ...................................................................... 18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................................. 8

*Ashour v. Arizona Beverages USA LLC*,
    2020 WL 5603382 (S.D.N.Y. Sept. 18, 2020) .................................................................. 10

*Axon v. Citrus World, Inc.*,
    354 F. Supp. 3d. 170 (E.D.N.Y. 2018) ................................................................................ 9

*Barton v. Pret A Manger (USA) Ltd.*,
    535 F. Supp. 3d 225 (S.D.N.Y. 2021) ............................................................................... 12

*Belfiore v. Procter & Gamble Co.*,
    311 F.R.D. 29 (E.D.N.Y. 2015)......................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................................. 7

*Carovillano v. Sirius XM Radio Inc.*,
    715 F. Supp. 3d 562 (S.D.N.Y. 2024) ............................................................................... 18

*Cobovic v. Mars Petcare US, Inc.*,
    2025 WL 1726261 (E.D.N.Y. June 20, 2025)........................................................ 10, 12, 13

*Colpitts v. Blue Diamond Growers*,
    527 F. Supp. 3d 562 (S.D.N.Y. 2021) ............................................................................... 23

*Critcher v. L'Oreal USA, Inc.*,
    959 F.3d 31 (2d Cir. 2020) .................................................................................................... 9

*Emilee Carpenter, LLC v. James*,
107 F.4th 92 (2d Cir. 2024) ......................................................................... 7

*Fink v. Time Warner Cable*,
714 F.3d 739 (2d Cir. 2013) ....................................................................... 11

*Goetz v. Ainsworth Pet Nutrition, LLC*,
768 F. Supp. 3d 645 (S.D.N.Y. 2025) .................................................... 11, 14

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
8 F. Supp. 3d 467 (S.D.N.Y. 2014) ......................................................... 24, 25

*Greene v. Gerber Prod. Co.*,
262 F. Supp. 3d 38 ...................................................................................... 24

*Guggenheimer v. Ginzburg*,
372 N.E.2d 17 (N.Y. 1977) ......................................................................... 11

*In re Kind LLC "Healthy & All Natural" Litig.*,
287 F. Supp. 3d 457 (S.D.N.Y. 2018) ......................................................... 9

*In re Lindt & Sprungli (USA), Inc., Dark Chocolate Litig.*,
2024 WL 4107244 (E.D.N.Y. Sept. 6, 2024) ............................................. 21

*Int'l Code Council, Inc. v. UpCodes Inc.*,
43 F.4th 46 (2d Cir. 2022) .......................................................................... 19

*Koenig v. Boulder Brands, Inc.*,
995 F. Supp. 2d 274 (2014) ........................................................................ 23

*MacNaughton v. Young Living Essential Oils, LC*,
67 F.4th 89 (2d Cir. 2023) .......................................................................... 24

*Mantikas v. Kellogg Company, supports Plaintiffs' position.*,
910 F.3d 633 (2d Cir. 2018) ........................................................... 14, 15, 19

*Matzell v. Annucci*,
64 F.4th 425 (2d Cir. 2023) .......................................................................... 7

*McCabe v. Nat'l Presto Indus., Inc.*,
2025 WL 2371080 (E.D.N.Y. Aug. 14, 2025) ................................... 7, 11, 14

*Orlander v. Staples, Inc.*,
802 F.3d 289 (2d Cir. 2015) ....................................................................... 23

*Paradowski v. Champion Petfoods USA, Inc.*,
2023 WL 3829559 (2d Cir. June 6, 2023) ...................................................................... 11

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014) ............................................................................................................ 9

*Porat v. Lincoln Towers Cmty. Ass'n*,
464 F.3d 274 (2d Cir. 2006) ........................................................................................... 25

*Preira v. Bancorp Bank*,
885 F. Supp. 2d 672 (S.D.N.Y. 2012) .......................................................................... 24

*Quiroz v. Beaverton Foods, Inc.*,
2019 WL 1473088 (E.D.N.Y. Mar. 31, 2019)............................................................... 9

*Richburg v. Conagra Brands, Inc.*,
2023 WL 1818561 (N.D. Ill. Feb. 8, 2023) ................................................................. 16

*Rodriguez v. Cheesecake Factory Inc.*,
2017 WL 6541439 (E.D.N.Y. Aug. 11, 2017) ............................................................. 18

*Silva v. Smucker Nat. Foods, Inc.*,
2015 WL 5360022 (E.D.N.Y. Sept. 14, 2015) ............................................................ 10

*Valentine v. Crocs, Inc.*,
2023 WL 12015530 (N.D. Cal. Apr. 28, 2023)............................................................ 21

*Venticinque v. Back to Nature Foods Co.*,
2024 WL 3385136 (2d Cir. July 12, 2024)................................................................... 15

*VR Glob. Partners, L.P. v. Petróleos de Venez., S.A.*,
2024 WL 4891271 (2d Cir. Nov. 26, 2024) ................................................................... 8

*Ward v. Pepperidge Farm, Inc.*,
773 F. Supp. 3d 10 (S.D.N.Y. 2025) ............................................................................ 10

*Washington v. Coca Cola Co.*,
2025 WL 2720463 (S.D.N.Y. Sept. 24, 2025) ............................................................ 20

*Watts v. Beiersdorf Inc.*,
2024 WL 5168765 (E.D.N.Y. Dec. 19, 2024).......................................................... 1, 23

*White v. Kroger Co.*,
2022 WL 888657 (N.D. Cal. Mar. 25, 2022) .............................................................. 21

*Wright v. Publishers Clearing House, Inc.*,
  439 F. Supp. 3d. 102 (E.D.N.Y. 2020) ................................................................. 23

**Statutes**

21 U.S.C. § 343-1(a)(3) ............................................................................................. 9

N.Y. General Business Law ("GBL") §§ 349 & 350 ................................................ 7, 8, 20, 23, 24

# I.  INTRODUCTION

New York's consumer protection statutes broadly prohibit deceptive advertising that is likely to mislead a reasonable consumer acting reasonably under the circumstances. This case is about the deceptive advertising by a company called LMNT, which manufactures and sells an electrolyte drink mix targeted to health-conscious consumers. The main selling points for LMNT are the quantity of the three electrolytes prominently featured on the front and back labels of the drink mixes—Sodium, Potassium, and Magnesium—along with LMNT's marketing claims that the drink mixes are a clean, whole-food supplement free from processed additives.

Contrary to LMNT's representations, the drink mixes contain a highly processed sweetener and filler called maltodextrin. To compound the deception, the amount of maltodextrin in the drink mixes exceeds the amount of Potassium and Magnesium *combined*. When the truth about maltodextrin came to light in October 2024, there was widespread backlash among health commentators and LMNT's customer base, so much so that LMNT publicly acknowledged "concerns" within the community. Plaintiffs are two of those customers who were deceived by LMNT's marketing claims and paid a price premium believing the drink mixes consisted primarily of natural electrolytes and were a clean, whole-food supplement.

LMNT moves to dismiss Plaintiffs' claims on a variety of grounds, including that the claims are preempted, that it is impossible to prove that a reasonable consumer was likely to be deceived, that LMNT's marketing claims are mere puffery, and that Plaintiffs have not adequately alleged an injury caused by the deceptive marketing. None of LMNT's arguments are persuasive. Because "[t]his is not one of the rare instances in which the Court may dismiss a consumer-protection claim on this posture," *Watts v. Beiersdorf Inc.*, 2024 WL 5168765, at *6 (E.D.N.Y. Dec. 19, 2024). LMNT's motion to dismiss should be denied.

## II. FACTUAL BACKGROUND

**A. LMNT Targets Health-Seeking Consumers with a Nutrition Supplement that Purportedly Consists Primarily of Natural Electrolytes.**

Defendant Drink LMNT, Inc. ("LMNT") manufactures, markets, and sells electrolyte drink mixes ("the Product") through its website, and at major retailers including Amazon and Walmart. Am. Compl. ¶¶ 1, 16.[1] On every box and packet of the Product, and throughout its advertising, LMNT highlights what it claims are the Product's three primary ingredients: 1000 mg of Sodium, 200 mg of Potassium, and 60 mg of Magnesium—all naturally occurring electrolytes. ¶¶ 9, 23, 26-27. On its website, LMNT makes additional promises about the Product to attract health-conscious consumers, including that the Product is keto and paleo "friendly," and perfect for those who follow a "whole food" diet. ¶¶ 23-25. Aware that health-conscious consumers who would pay upwards of $45 for an electrolyte supplement care about avoiding processed ingredients and additives, ¶ 52, LMNT assures its customers that the Product contains "everything you need and nothing you don't," and is free from "dodgy ingredients," ¶ 25. LMNT repeats these claims through its other marketing channels, including on LMNT's Amazon.com page, which states that "[a]ll day energy starts with *clean* hydration," and that the Product is "paleo-keto friendly" and contains "no dodgy ingredients." ¶ 29.

LMNT knows that its representations carry specific meanings to the health-conscious consumers LMNT targets. As LMNT explains on its website, a "whole foods diet consists of eating foods in their natural state, or as close as possible to it" and avoiding "[p]rocessed foods" that are "full of refined carbs, sugar, vegetable oils, and food additives." ¶¶ 39-40. LMNT explains that when it comes to a whole food diet, "[p]rocessed foods — foods that have been altered to be hyperpalatable (AKA unnaturally tasty) or have an extensive list of added ingredients — get the

---

[1] All citations to ¶ refer to Plaintiffs' First Amended Class Action Complaint, Dkt. 18.

boot." ¶ 39. LMNT likewise explains that, like individuals who adhere to a whole-food diet, "those on a ketogenic diet, [] should be eating mostly meats, fish, eggs, and nonstarchy veggies. In other words, whole foods that have a lesser effect on blood glucose and therefore a lesser [blood glucose] impact when displaced." ¶ 43. LMNT goes on to explain that foods that are high on the glycemic index like sugar "slam[] the door on ketosis." ¶ 44. Like whole food and keto diets, the paleo diet consists of eating "fruits, vegetables, lean meats, fish, eggs, nuts, and seeds," while at the same time avoiding "processed foods." ¶ 48.

By prominently featuring the three natural electrolytes on the front and back labels and making other marketing claims on its website, LMNT conveys to reasonable consumers that the Product is a clean, whole-food supplement that consists primarily of essential electrolytes and is free from highly processed food additives. ¶¶ 27, 51.

**B.  LMNT Contains a Substantial Amount of Maltodextrin, a Highly Processed Food Additive.**

Despite LMNT's affirmative representations concerning the contents and quality of the Product, LMNT contains between 300 mg and 450 mg of maltodextrin per serving. ¶¶ 30, 36. Maltodextrin is a highly processed refined sweetener and filler commonly used in processed foods. ¶¶ 31-32. It has a higher glycemic index than table sugar, and, like other high-glycemic index foods, can cause a spike in blood glucose and insulin levels. *Id*. Research indicates that the consumption of maltodextrin "leads to the promotion of intestinal inflammation," and "could be a risk factor for chronic inflammatory diseases." ¶ 50.

Because LMNT does not disclose its use of maltodextrin anywhere on the Product labels or on the product pages of its website, Plaintiffs and other LMNT customers were unaware that the Product contained maltodextrin, let alone more maltodextrin than Potassium and Magnesium— two of the Product's three primary electrolytes—combined. ¶ 60. Indeed, even one of LMNT's

3

co-founders, Luis Villasenor, publicly represented in October 2024 that LMNT did not contain maltodextrin. ¶ 34. The next day, a different co-founder, Robb Wolf, posted on X that Villasenor's comments were a "mistake" and that Villasenor was not involved in day-to-day operations with LMNT.[2] ¶ 35.

When LMNT's maltodextrin content came to light, it unleashed a wave of public backlash. ¶ 60. Physicians, nutritionists, keto-focused educators, and other prominent voices in the health and metabolic community responded critically to both LMNT's use of maltodextrin and lack of transparency. ¶ 61. These criticisms emphasized that maltodextrin is not a neutral additive, especially for individuals managing blood sugar, insulin resistance, or other therapeutic diets. *Id.* Voices in the keto and metabolic health communities decried LMNT's use of maltodextrin because of their concerns about its effect on people's blood sugar and insulin production. ¶¶ 65-67, 70. These same voices echoed concerns over LMNT's "breach of trust" with its customers because LMNT failed to conform with its marketing promises. ¶¶ 68-70.

Consumer backlash echoed and amplified health experts' concerns and outcry about LMNT's misrepresentations. ¶¶ 73, 81-82. LMNT consumers expressed that they were "disappointed," "disillusioned," and "devastated" by the revelation of maltodextrin in LMNT. ¶¶ 73-76. And these consumers stressed that they selected the Product because of LMNT's positioning and claims that the Product aligned with the consumers' health-conscious goals. ¶ 77. Consumers on keto diets relayed specific concerns about the Product's maltodextrin content, expressing that maltodextrin produced an insulin response that endangered the consumers' ability to maintain therapeutic levels of ketosis for medical or metabolic reasons. ¶ 78. Many consumers

---

[2] Villasenor is the author of the LMNT blog post discussing the keto diet referenced in paragraphs 43 and 44 of the Amended Complaint.

also expressed outrage at being told the Product had "no dodgy ingredients," despite containing maltodextrin. ¶ 76.

In the wake of the growing backlash, LMNT co-founder Robb Wolf updated a July 2024 blog post discussing "natural flavors," which had discretely mentioned that LMNT "may include a pinch of maltodextrin." Decl. of Jeffrey Brams ("Brams Decl."), Ex. C. In the October 2024 update, Wolf disclosed that "each stick pack" of the Product contained between approximately 300 mg and 450 mg of maltodextrin. ¶ 36. Wolf also wrote, "We recognize and honor that LMNT is a companion on many unique health journeys, which is why we're actively working to address concerns raised by folks who are sensitive to maltodextrin (even in small amounts)." ¶ 37.

### C. Plaintiffs and Other LMNT Customers Paid More for the Product Because of LMNT's False and Misleading Representations.

LMNT's marketing of the Product as a whole-food nutritional supplement that consisted primarily of natural electrolytes and was free from highly processed food additives allowed LMNT to charge a price premium. ¶ 52. Specifically, LMNT was able to charge an inflated price by capitalizing on the desires of health-conscious consumers to avoid highly processed additives. *Id.*

Many of LMNT's competitors are transparent about their use of maltodextrin or expressly disclaim reliance on maltodextrin given consumer sentiment around processed additives. ¶ 54. For example, two sugar-free electrolyte products from Gatorade and another competitor, DripDrop, explicitly disclose that their products contain maltodextrin in the product ingredient lists. ¶ 55. Other competitors explicitly and intentionally avoid including maltodextrin in their electrolyte products. ¶¶ 56-57. A competitor called SALTT, for example, wrote an article stating, "There's been a lot of excitement lately of what, exactly is meant by 'natural flavors' in supplements. Rest assured that we don't have any maltodextrin or sugar in our products." ¶ 57. In response to questions about whether it used maltodextrin under the label "natural flavors," SALTT wrote, "In

short: No, we do not use 'Natural Flavors' or 'Artificial Flavors' to hide ingredients in our products[.] We strongly believe in being honest and open about what is in our products and wish all companies would take it as seriously as we do." *Id.*

Instead of following the practices of its competitors, LMNT chose to position its Product as a clean, whole-food electrolyte supplement free from processed food additives, all while concealing that the Product contained more maltodextrin than two of the three primary electrolytes. ¶ 58. This positioning allowed LMNT to demand a price premium based on attributes the Product does not have. *Id.*

Like other consumers, Plaintiffs Michael Sciortino and Josh Sawyer purchased LMNT after viewing LMNT's advertising and promises about the Product. ¶¶ 14-15. Based on his review of LMNT's website, Plaintiff Sciortino believed that the Product consisted primarily of Sodium, Potassium, and Magnesium and that the Product was a clean, whole-food supplement free from processed food additives. ¶ 14. Similarly, Plaintiff Sawyer researched the Product on LMNT's website before purchasing the Product and—after seeing LMNT's claims about the Product being paleo and keto friendly, consistent with a whole-food diet, and containing no "dodgy ingredients"—believed he was purchasing a whole-food supplement free from processed food additives. ¶ 15. He decided to purchase LMNT instead of other competitor electrolyte supplements because of this belief. *Id.* When Plaintiffs learned about the Product's maltodextrin content, they felt misled by LMNT's marketing claims. ¶¶14-15. They would not have purchased or would have paid significantly less for the Product had they known about LMNT's deceptive advertising. *Id.*

### III.    REQUEST FOR JUDICIAL NOTICE

Plaintiffs do not object to LMNT's request for judicial notice of Exhibits A and C. But Plaintiffs oppose the request for judicial notice of Exhibits B and D. LMNT states that Exhibit B

is "a true and correct copy of an earlier version of that same publicly available blog post [found in Exhibit A], titled 'What's the deal with Natural Flavors?' which was posted on LMNT's website at least as early as June 6, 2024." Brams Decl. ¶ 3. LMNT also states that "Exhibit B is also available online via the Internet Archive's Wayback Machine . . . a copy of which is attached . . . as Exhibit C." *Id.* In other words, LMNT asserts that Exhibit B and Exhibit C are the same document just in different formats. Yet a comparison of the language between the two documents indicates they are not the same. For example, Exhibit C contains a bullet point list of various facts on maltodextrin, including the claim that LMNT contains a "miniscule amount." Brams Decl., Ex. C at 3. Exhibit B does not have the same bullet point list, nor the claim about a "miniscule amount" of maltodextrin. Brams Decl., Ex. B at 4. Because Exhibit B is not the same document as Exhibit C, and it is unclear whether Exhibit B was ever posted on the LMNT website, judicial notice is not appropriate based on the authorities cited by LMNT.

Plaintiffs also oppose the request for judicial notice of Exhibit D, a copy of LMNT's return policy. The content of LMNT's return policy is neither referenced nor relied upon in Plaintiffs' Amended Complaint. Moreover, LMNT's return policy has no relevance to Plaintiffs' claims under N.Y. General Business Law ("GBL") §§ 349 and 350. *See McCabe v. Nat'l Presto Indus., Inc.*, 2025 WL 2371080 (E.D.N.Y. Aug. 14, 2025).

### IV.    MOTION TO DISMISS STANDARD

"In order to survive a motion to dismiss, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is plausibly alleged 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matzell v. Annucci*, 64 F.4th

425, 433 (2d Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In making this assessment, the court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *VR Glob. Partners, L.P. v. Petróleos de Venez., S.A.*, 2024 WL 4891271, at *2 (2d Cir. Nov. 26, 2024).

## V.     ARGUMENT

Plaintiffs state plausible claims for relief under GBL §§ 349 and 350. Because the claims challenge LMNT's affirmative misrepresentations and not the mere failure to disclose the Product's maltodextrin content, the claims are not preempted by federal law. Further, because reasonable consumers in the target market—*i.e.* "health-seeking consumers"—could be, and in fact were, deceived by LMNT's misrepresentations, and the misrepresentations are provably false, the challenged marketing claims are actionable. Finally, Plaintiffs allege sufficient facts to establish that they paid a price premium for the Products as a result of their exposure to LMNT's deceptive marketing.

### A.     Plaintiffs' Claims are Not Preempted Because Plaintiffs Do Not Seek to Impose Requirements that Conflict with Federal Law.

LMNT argues that Plaintiffs' claims are expressly preempted by federal law because the claims "seek to impose additional requirements beyond those imposed by federal law and regulations." Def. Mem. at 6-9. Despite LMNT's attempt to reframe the Amended Complaint to focus on allegations of LMNT's *concealment* of maltodextrin, a plain reading of the Amended Complaint demonstrates that Plaintiffs' claims are predicated on LMNT's *affirmative misrepresentations* and are therefore not preempted.

The federal Food, Drug, and Cosmetic Act ("FDCA") "'forecloses a State or political subdivision of a State' from establishing requirements that are of the type but 'not identical to' the

requirements in some of the misbranding provisions of the FDCA" and enforcement of the FDCA is "largely committed to the FDA." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 109, 115 (2014) (citation modified). To that end, "no state . . . may directly or indirectly establish . . . any requirement for the labeling of food of the type required by [the FDCA] that is not identical to" the FDCA's requirements. 21 U.S.C. § 343-1(a)(3). Plaintiffs do not dispute that their GBL claims cannot impose "requirements 'different from' or 'in addition to'—or otherwise 'not identical with'—those requirements that federal law already imposes." *Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 36 (2d Cir. 2020).

But Plaintiffs do not allege that LMNT must disclose maltodextrin any differently than required by federal law. Instead, Plaintiffs allege that if LMNT continues to omit maltodextrin from the Product's labeling and marketing—in contrast to its competitors—LMNT may not simultaneously represent that the Product consists primarily of natural electrolytes, is keto and paleo "friendly," is consistent with a "whole food" diet, and contains "no dodgy ingredients." ¶¶ 9-12. Put differently, Plaintiffs seek to "ensure [LMNT's] labels are truthful" not "impose new standards or requirements in connection with their consumer protection claims." *See In re Kind LLC "Healthy & All Natural" Litig.*, 287 F. Supp. 3d 457, 464 (S.D.N.Y. 2018).

Multiple courts have rejected preemption arguments similar to those advanced by LMNT. In *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d. 170, 180 (E.D.N.Y. 2018), for example, defendant argued that "plaintiff's claims [were] expressly preempted because she [sought] to impose labeling requirements on defendant regarding the presence of glyphosate that are different from federal law." In rejecting this argument, the court highlighted that plaintiff did not assert that defendant had to disclose glyphosate but instead argued that defendant could not simultaneously label its products as "natural." *Id.* at 180; *see also Quiroz v. Beaverton Foods, Inc.*, 2019 WL 1473088, at

\*6 n.2 (E.D.N.Y. Mar. 31, 2019) (finding plaintiff's misleading-representation claim not preempted where the claim did not concern "whether Defendant properly disclosed" an ingredient but instead asserted that Defendant should not be given "free rein to deceptively mischaracterize those ingredients on others parts of its label in contravention of state law" (citation modified)); *Silva v. Smucker Nat. Foods, Inc.*, 2015 WL 5360022, at \*4 (E.D.N.Y. Sept. 14, 2015) (finding that plaintiff's misleading-labeling claims were "beyond the preemptive reach of the FDCA"); *Ward v. Pepperidge Farm, Inc.*, 773 F. Supp. 3d 10, 16, 22 (S.D.N.Y. 2025) (rejecting defendant's argument that based on FDA regulation of preservatives, plaintiff's claims that a product's "No Preservatives" packaging was materially misleading were preempted and noting that "a claim to remove the label" did "not conflict with the federal requirement, which only mandates identifying the preservative") (citation modified); *Ashour v. Arizona Beverages USA LLC*, 2020 WL 5603382, at \*3 (S.D.N.Y. Sept. 18, 2020) ("Plaintiff's state law claim that Defendants deceptively labeled their beverages as containing 'No Preservatives' does not conflict with the federal [labelling] requirement, which only mandates identifying the preservative.").

In sum, Plaintiffs' core allegations—that LMNT makes affirmative misrepresentations concerning the contents and quality of the Product's ingredients—do not impose a standard inconsistent with federal law. ¶¶ 38-47, 51. LMNT's preemption argument should be rejected.

**B.** **Plaintiffs Adequately Allege That Reasonable Consumers Could be Misled by LMNT's Misrepresentations.**

"Under New York law, courts apply an objective standard in determining whether acts or practices are materially deceptive or misleading to a reasonable consumer acting reasonably under the circumstances." *Cobovic v. Mars Petcare US, Inc.*, 2025 WL 1726261, at \*3 (E.D.N.Y. June 20, 2025) (citation modified). Plaintiffs "must establish a probability that a significant portion of the general consuming public or of targeted consumers,"—here, "health-seeking consumers,"—

"acting reasonably in the circumstances, could be misled." *Id.* (citation modified). "[W]hile 'significant portion' has yet to be defined by the Second Circuit, there are reasons to think it does not impose a particularly onerous burden on Plaintiffs." *Goetz v. Ainsworth Pet Nutrition, LLC*, 768 F. Supp. 3d 645, 655 n.2 (S.D.N.Y. 2025). Indeed, the New York Court of Appeals has "counseled that the GBL's consumer protections are intentionally broad in scope and that the reach of these statutes provides needed authority to cope with the numerous, ever-changing types of false and deceptive business practices." *Id.* (citation modified).

"[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013). Thus, "courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole." *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015) (citation modified). This involves an analysis of the "entire mosaic" rather than "each tile separately." *Id.* (citation modified); *see also Paradowski v. Champion Petfoods USA*, Inc., 2023 WL 3829559, at *2 (2d Cir. June 6, 2023) ("A 'reasonable consumer' includes those 'who, in making purchases, do not stop to analyze but are governed by appearances and general impressions.'" (quoting *Guggenheimer v. Ginzburg*, 372 N.E.2d 17, 19 (N.Y. 1977))).

"While it is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer, generally this inquiry is not appropriate on a motion to dismiss." *Goetz*, 768 F. Supp. 3d at 654-55 (citation modified). "Typically, determining reasonableness as a matter of law is appropriate only where a plaintiff's claims are patently implausible or unrealistic." *Id.* at 655 (citation modified); *see also McCabe*, 2025 WL 2371080, at *4 (observing that "dismissal at the motion to dismiss stage is warranted only in a rare situation where it is impossible for the plaintiff to prove that a reasonable consumer

11

was likely to be deceived") (citation modified); *Barton v. Pret A Manger (USA) Ltd.*, 535 F. Supp. 3d 225, 237 (S.D.N.Y. 2021) ("It is important to remember that at least in some cases, a federal trial judge, with a background and experience unlike that of most consumers, is hardly in a position to declare that reasonable consumers would not be misled.") (citation modified).

Plaintiffs adequately allege that a significant portion of LMNT's "targeted consumers, acting reasonably, in the circumstances could be misled." *Cobovic*, 2025 WL 1726261, at *3 (citation modified). LMNT understands that its "primary target market are health-seeking consumers looking to support their electrolyte needs." ¶ 22. LMNT tailors its marketing claims specifically to that target audience. To that end, LMNT deliberately positions its Product as a clean, whole-foods supplement free from highly processed additives, precisely to align with the values and purchasing expectations of "health-seeking consumers." *Id.*

The "entire mosaic" of LMNT's marketing claims include representations that the Product is keto and paleo "friendly," that it is "clean" and perfectly suited to individuals following "whole food diets," that it "contains everything you need and nothing you don't," and that it is free from "dodgy ingredients." ¶¶ 23-25, 29. These claims are reinforced by LMNT prominently displaying on the front label of every Product what LMNT claims are the three primary ingredients—Sodium, Potassium, and Magnesium—all of which are naturally occurring electrolytes. The back label further reinforces the impression that LMNT is a clean, whole-foods supplement that consists primarily of electrolytes along with what reasonable consumers would understand are other natural, whole-food ingredients such as "Stevia Leaf Extract" and "Natural Lemon Flavor." ¶ 24.

Unbeknownst to consumers, the Product contains maltodextrin in quantities that exceed the Potassium and Magnesium content—two of the Product's supposed primary ingredients—

combined.[3] Because maltodextrin is highly processed, has no nutritional value, and is higher on the glycemic index than table sugar, the presence of maltodextrin at levels that exceed the Potassium and Magnesium content is fundamentally at odds with LMNT's marketing claims. When revelations about LMNT's substantial reliance on maltodextrin came to light through public reporting, there was widespread backlash within the LMNT community and among health commentators. For example, a board-certified physician following the scandal highlighted, "There is MORE maltodextrin in LMNT than Potassium and Magnesium COMBINED. It's literally a salt + maltodextrin supplement." ¶¶ 68-70.

Thousands of LMNT's target customer base likewise expressed public outrage at LMNT's deceptive advertising, voicing concerns that echoed Plaintiffs' experience of relying on LMNT's claims that the Product was a clean, whole-foods supplement, only to find themselves deceived when LMNT's use of maltodextrin came to light. The backlash was so widespread that even LMNT publicly acknowledged that it was "actively working to address concerns raised by folks who are sensitive to maltodextrin." ¶ 37. These allegations are sufficient to establish that targeted consumers for LMNT—health seeking consumers looking to support their electrolyte needs— "acting reasonably in the circumstances, could be" and were "misled." *See Cobovic*, 2025 WL 1726261, at *3.

---

[3] On this point, LMNT plays word games, arguing that Potassium and Magnesium are *not* ingredients; they are electrolytes present in "potassium chloride" and "magnesium malate" as disclosed on the ingredient list. *See* Def. Mem. at 10-11. But the issue is not how the back label classifies ingredients in the technical sense. Plaintiffs allege that they and reasonable consumers would understand that, based on the Product's front label and LMNT's marketing claims, Potassium and Magnesium are two of the three primary ingredients in the Product. And that understanding is consistent with the ordinary meaning of "ingredient:" "something that enters into a compound or is a component part of any combination or mixture." *See* https://www.merriam-webster.com/dictionary/ingredient (last accessed October 9, 2025). It is also consistent with how LMNT marketed the Product, prominently featuring specific quantities of Sodium, Potassium, and Magnesium on the front label and on its website under the heading "What's Inside?" ¶ 26.

### 1. LMNT's Misrepresentations Misled Reasonable Consumers.

Despite Plaintiffs' detailed allegations in the Amended Complaint, LMNT argues that Plaintiffs' claims are "patently implausible or unrealistic," *Goetz*, 768 F. Supp. 3d at 655, and that this case presents the "rare situation where it is impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived," *McCabe*, 2025 WL 2371080, at \*4. LMNT's arguments do not hold up to scrutiny.

*First*, LMNT mischaracterizes Plaintiff's theory, contending that nothing about the Product's labeling or marketing implies that the Product consists *solely* of the three electrolytes featured on the front label. But Plaintiffs never made that claim. Rather, Plaintiffs argue that the "entire mosaic" of LMNT's marketing—prominently featuring the three electrolytes on the front and back label as the primary ingredients in the Product, claiming the Product is keto and paleo "friendly," and representing that the Product contains "no dodgy ingredients"—implies that the Product consists primarily of natural electrolytes and, at a minimum, that the Product does not contain more maltodextrin than two of the three primary electrolytes combined.

The Second Circuit's decision in *Mantikas v. Kellogg Company*, supports Plaintiffs' position. 910 F.3d 633 (2d Cir. 2018). In that case, the plaintiffs' core allegation was that statements "'WHOLE GRAIN' and 'MADE WITH WHOLE GRAIN'" on the front of the Cheez-It box were "misleading because they communicate[d] to the reasonable consumer that the grain in the product [was] predominantly, if not entirely, whole grain." *Id.* at 637. In fact, "the grain in the product [was] predominantly enriched white flour," as confirmed by the side panel of the Cheez-It box. *Id.* The Second Circuit concluded that the claims on the front label were actionable because, "[t]he representation that a cracker is 'made with whole grain' would . . . plausibly lead a reasonable consumer to conclude that the grain ingredient was entirely, or at least predominately, whole grain." *Id.* at 638. So too here. LMNT's prominent claim on the front label

that the Product consists of natural electrolytes—Sodium, Potassium, and Magnesium—plausibly lead a reasonable consumer to conclude that natural electrolytes are the predominant ingredients in the Product. That belief is false because the Product contains more maltodextrin than Potassium and Magnesium combined. And, unlike in *Mantikas*, a reasonable consumer cannot simply flip the package over to dispel the misrepresentation, because neither the back label nor LMNT's marketing claims on its website say anything about maltodextrin.

LMNT tries to sidestep *Mantikas* by relying on *Kennedy v. Mondelez Global LLC*, where the court found the claim "made with honey" on the package of graham crackers non-actionable because the honey in the graham crackers was "in the form of a honey-sugar blend." 2020 WL 4006197, at *13 (E.D.N.Y. July 10, 2020). The court observed that "a reasonable consumer could not be misled into thinking that 'made with honey' means the grahams contain more honey than sugar, *because honey is not the primary ingredient in grahams*." *Id.* at *13 (emphasis added). As the court explained, "[t]he representations related to honey [fell] well within the consistent line of cases that hold similar representations about *non-dominant* ingredients are non-deceiving, including those cited by *Mantikas*." *Id.* (emphasis added). Unlike *Kennedy*, LMNT markets the Product as an electrolyte drink mix in which naturally occurring electrolytes—Sodium, Potassium, and Magnesium—are ostensibly the primary or dominant ingredients. Given the Product's labeling—combined with claims that the Product is keto and paleo "friendly," "clean," consistent with a "whole food" diet, and contains no "dodgy ingredients"—a reasonable consumer would conclude that the Product consists *primarily* of natural electrolytes. *See Venticinque v. Back to Nature Foods Co.*, 2024 WL 3385136, at *2 (2d Cir. July 12, 2024) (finding claim actionable because it "arguably falsely implied that a prominently-mentioned ingredient—one that obviously was the products' primary ingredient—predominates") (citation modified). At a minimum, a

reasonable consumer would not conclude that a highly processed food additive like maltodextrin predominates over two of the three supposed primary ingredients and that the Product is, in fact, "a salt + maltodextrin supplement." ¶ 70.

**Second**, LMNT argues that reasonable consumers could not be misled given the FDA's technical regime related to "natural flavors," which arguably allow companies like LMNT to mask maltodextrin under the generic "natural flavors" label. LMNT points to *Richburg v. Conagra Brands, Inc.*, 2023 WL 1818561 (N.D. Ill. Feb. 8, 2023), where the Northern District of Illinois found claims concerning the failure to disclose PFAS in a product non-actionable because reasonable consumers would not consider PFAS an ingredient that required disclosure and because PFAS was regulated differently from traditional food ingredients. *Id.* at *7. While technical FDA regulations may allow LMNT to conceal maltodextrin under the "natural flavors" label, it does not follow that reasonable consumers can infer the presence of maltodextrin or other highly processed additives based solely on the Product's disclosure of, for example, "Natural Lemon Flavor." Unlike PFAS, maltodextrin is disclosed on ingredient labels, including by LMNT's competitors, ¶ 55, and the widespread fallout in the LMNT community in the wake of the maltodextrin revelations confirm that reasonable consumers in the target market were deceived. And given LMNT's marketing claims that the Product is a clean, whole-foods supplement, free from highly processed food additives, reasonable consumers would have no basis to believe the Product contained maltodextrin, let alone at levels that exceed those of Potassium and Magnesium combined.

LMNT argues that potassium chloride and magnesium malate—the compounds containing the 200 mg of Potassium and 60 mg of Magnesium prominently featured on both the front and back labels of the Product—are each "present in greater amounts than the entirety of the natural

flavor ingredient—including its flavor carrier, maltodextrin." Def. Mem. at 13. But this is a sleight of hand that attempts to downplay the reality of LMNT's misrepresentations. LMNT's co-founder stated that "each stick pack" of the Product contains approximately 300 mg to 450 mg of maltodextrin, ¶ 36—more than the Potassium (200 mg) and Magnesium (60 mg) content combined. Whether the added weight of the "chloride" and the "malate" elements tip the scales to exceed the full weight of the "natural flavor" ingredient is immaterial. What matters is LMNT represents to consumers that the Product consists primarily of Sodium, Potassium, and Magnesium, when, in fact, maltodextrin predominates over both Potassium and Magnesium. To the extent LMNT raises a factual dispute on this issue, that dispute "cannot properly be resolved on a motion to dismiss," *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *13 (E.D.N.Y. Aug. 29, 2013), and Plaintiffs' allegations in the Amended Complaint—repeating statements from LMNT's co-founder—must be taken as true.

***Third***, LMNT contends that, to the extent the front label of the Product is misleading, the ingredient list and nutrition facts panel dispel any deception because they disclose the presence of "Stevia Leaf Extract" and "Natural Lemon Flavor." Def. Mem. at 13. LMNT does not explain, however, how reasonable consumers would discern that these are "processed" ingredients, since stevia is a well-known *natural* sweetener and "Natural Lemon Flavor," implies to a reasonable consumer just what it says: *natural* flavor from lemons. Nor would reasonable consumers conclude that, given the presence of stevia and Natural Lemon Flavor, the Product contains maltodextrin at levels that exceed two of the three primary electrolytes.

LMNT similarly argues that the disclosure of "Natural Lemon Flavor" and the carbohydrate content on the back label specifically undermine any claim of deception based on LMNT's representation that the Product is keto or paleo friendly. Def. Mem. at 14. LMNT relies

on *Walcoff v. Innofoods USA, Inc.*, where the Southern District of California found claims like "keto-friendly" non-actionable because "the Products' front labels prominently disclose[d] that the Products contain[ed] '4g net carbs' and '3g sugars' per serving," and the back label "clearly disclose[d] that the Products contain[ed] . . . 'high-carb sweeteners' such as "cane sugar, brown rice sugar, and tapioca syrup." 2023 WL 3262940, at *8 (S.D. Cal. May 4, 2023). Unlike in *Walcoff*, however, Plaintiffs do not base their deceptive advertising claims on the mere presence of carbohydrates. Rather, Plaintiffs allege that the Product is not keto "friendly," because, as LMNT itself acknowledges, foods high on the glycemic index like sugar "slam[] the door on ketosis." ¶ 44. And because maltodextrin is higher on the glycemic index than sugar itself, maltodextrin is fundamentally incompatible with the keto diet, regardless of its carbohydrate content. ¶¶ 45-46. Further, because maltodextrin is highly processed—again, independent of its carbohydrate content—it is not paleo "friendly." ¶¶ 48-49. Unlike in *Walcoff*, where all the ingredients were disclosed on the product's packaging, LMNT's customers were left in the dark about the Product's maltodextrin content.

*Finally*, LMNT argues that no reasonable consumer could be misled because "LMNT publicly disclosed the presence of maltodextrin as a 'flavor carrier' in the Product." Def. Mem. at 15. To be sure, "a practice is not deceptive when a business provides conspicuous notice of that practice to consumers before purchase." *Carovillano v. Sirius XM Radio Inc.*, 715 F. Supp. 3d 562, 576 (S.D.N.Y. 2024); *see also Rodriguez v. Cheesecake Factory Inc.*, 2017 WL 6541439, at *3 (E.D.N.Y. Aug. 11, 2017) (collecting cases and observing that "[c]ourts generally consider a practice not to be misleading within the meaning of § 349 when a plaintiff is provided with all the information necessary to understand the practice and its consequences—a concept sometimes referred to as 'full disclosure'"). But a single obscure blog post on the LMNT website—entirely

18

separate from the website's product pages where the marketing claims are displayed—does not meet the standard of "conspicuous notice" or "full disclosure." Even one of LMNT's co-founders and blog co-author was not aware the Product contained maltodextrin, ¶¶ 34, 43, demonstrating the lack of "conspicuous notice." Plaintiffs reference the blog post in their Amended Complaint, not because they reviewed and relied on the blog post before purchasing the Product, but because the updated post from October 2024 documents LMNT's acknowledgment of customer "concerns" in the wake of public reporting on the maltodextrin revelations. Simply put, LMNT's blog post cannot cure the prominent misrepresentations on the LMNT website and Product label. *Cf. Mantikas*, 910 F.3d at 639 (holding that "small print on an ingredients list on the side of the package," did not cure misleading front label).

### 2. LMNT's Misrepresentations are Not Mere Puffery.

LMNT also contends that its marketing claims are "non-actionable puffery because they are merely subjective assertions of opinion by LMNT as to the 'superiority' of the Product that 'cannot be provided either true or false." Def. Mem. at 16 (quoting *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 59-60 (2d Cir. 2022)). This form of puffery "encompasses subjective claims about products, which cannot be proven either true or false," and which "often manifests as exaggerations or overstatements that mention nothing specific, but rather amount to general claims of superiority expressed in broad, vague, and commendatory language that are considered to be offered and understood as an expression of the seller's opinion only." *Int'l Code Council*, 43 F.4th at 59-60 (citation modified). Because LMNT's claims are provably false, they are not puffery.

First, the claims prominently featured on the front label of every Product—"1000 mg Sodium, 200 mg Potassium, 60 mg Magnesium"—communicate to the reasonable consumer that the Product "is predominantly, if not entirely," natural electrolytes. *See Mantikas*, 910 F.3d at 637.

19

That claim is provably false because, in fact, as LMNT was forced to acknowledge, each pack of the Product contains between 300 mg and 450 mg of maltodextrin, which means the maltodextrin content predominates over two of the three electrolytes combined. Because the labeling claims are false based on objective criteria—the weight of the respective substances—the claims do not constitute mere puffery.

The same is true for LMNT's claims that the Product contains "everything you need and nothing you don't." The statement is objectively false because LMNT undisputedly does not contain "everything" consumers need. Nor does LMNT contain "nothing" they do not need— maltodextrin being the prime example. The question is therefore whether this claim constitutes a "second form of puffery[, which] involves exaggerated, blustering, and boasting statements that are objective—and therefore technically provable—but upon which no reasonable buyer would be justified in relying." *Int'l Code Council*, 43 F.4th at 60. Given the "entire mosaic" of LMNT's marketing claims, a reasonable consumer would be justified in relying on LMNT's claim that the Product contains "nothing" unnecessary "to support their electrolyte needs." ¶ 22. Maltodextrin and other highly processed additives are not necessary to support electrolyte needs—indeed, some of LMNT's competitors expressly disclaim using maltodextrin. LMNT's claim that the Product contains "nothing" unnecessary is therefore not puffery.

LMNT's claim that the Product contains "no dodgy ingredients" fares no better. "Courts within this Circuit routinely rely on accredited dictionary definitions to assess how a reasonable consumer would interpret a term in cases arising under sections 349 and 350 of the GBL." *Washington v. Coca Cola Co.*, 2025 WL 2720463, at *3 (S.D.N.Y. Sept. 24, 2025). The Merriam-Webster's Dictionary defines "dodgy" as "not sound, good, or reliable" and "questionable, suspicious." Merriam-Webster Online Dictionary, https://www.merriam-

webster.com/dictionary/dodgy (last visited October 7, 2025). The "no dodgy ingredients" claim is provably false because a critical mass of the target market for LMNT—"health-seeking consumers," ¶ 22—consider maltodextrin an unsound, questionable, and suspicious food additive, especially in quantities that exceed two of the three primary electrolytes in the Product. Numerous consumers specifically called out LMNT for claiming the Product had "no dodgy ingredients," despite the presence of maltodextrin. ¶ 76. "Considering the packaging as a whole, these statements are not simply puffery[,] because a reasonable customer could interpret [LMNT's] statements as representations about the quality of the [Product's] ingredients, and, more specifically, an absence of [maltodextrin]." *In re Lindt & Sprungli (USA), Inc., Dark Chocolate Litig.*, 2024 WL 4107244, at *6 (E.D.N.Y. Sept. 6, 2024).

LMNT's claims that the Product is keto- and paleo-"friendly" are likewise provably false. LMNT cites to a series of cases finding the "friendly" modifier non-actionable puffery, but in those cases the labels modified by "friendly" were themselves broad and vague. Def. Mem. at 18 (citing cases involving claims of "pet-friendly," "environmentally friendly," "user-friendly," and "grower-friendly"). Where, as here, "friendly" modifies terms with specific criteria, the phrase does not constitute puffery. *See White v. Kroger Co.*, 2022 WL 888657, at *2 (N.D. Cal. Mar. 25, 2022) ("Where a reasonable inference exists that consumers may be looking for sunscreen products that are not damaging to reefs, however, 'reef friendly' may reasonably be understood as implying defendants' products meet those criteria."); *Valentine v. Crocs, Inc.*, 2023 WL 12015530, at *5 (N.D. Cal. Apr. 28, 2023) (finding claim that Crocs shoes were "water-friendly" created an express warranty, while related claim that Crocs "fit perfectly" constituted puffery). LMNT acknowledges that substances high on the glycemic index like sugar are fundamentally incompatible with the keto diet because they spike blood sugar levels. ¶¶ 42-44. For that reason, health experts have

identified maltodextrin as antagonistic to the keto diet based on objective criteria. ¶ 46. Similarly, because the paleo diet eschews highly processed foods, and maltodextrin is one such highly processed food additive, maltodextrin is demonstrably incompatible with the paleo diet. ¶¶ 48-49.

In the same way, LMNT's claims that the Product is "clean" and perfectly suited for those who adhere to a "whole food" diet do not constitute mere puffery. LMNT itself defines a "whole food" diet as one that excludes processed foods—declaring in no uncertain terms that, "[p]rocessed foods—foods that have been altered to be hyperpalatable (AKA unnaturally tasty) or have an extensive list of added ingredients—get the boot." ¶ 39. LMNT tries to walk back this statement by claiming that "LMNT makes no assertions that the Product is *strictly* compatible with a whole foods diet." Def. Mem. at 18 (emphasis added). But LMNT's description of a whole food diet leaves no room for highly processed food additives like maltodextrin, especially in quantities that exceed two of the three primary electrolytes in the Product. LMNT's claims that the Product is "clean" and consistent with a "whole food diet" are false according to LMNT's own standards.[4]

### 3. Plaintiffs Adequately Allege An Injury Caused by LMNT's Deceptive Marketing.

Plaintiffs plausibly allege that LMNT charged an artificially inflated price for the Product by deceptively marketing the Product as a "clean," "whole-food" electrolyte supplement while concealing that the Product contains a substantial amount of maltodextrin—a highly processed food additive. ¶ 52. Because of LMNT's deceptive marketing, Plaintiffs paid a "price premium" for the Product they would not have paid had they known the truth. ¶ 53. This price premium that

---

[4] LMNT also argues that, to the extent Plaintiffs assert an omission-based claim, the claim must fail because LMNT disclosed its use of maltodextrin in the July 2024 blog post. Def. Mem. at 20. As discussed in the preemption analysis, however, Plaintiffs do not assert an omission-based claim and instead focus their claims on LMNT's affirmative misrepresentations.

plaintiffs paid to LMNT adequately alleges a "familiar," "standard," and sufficient injury under GBL §§ 349 and 50. *See Watts*, 2024 WL 5168765, at *2-3.

"Injury is adequately alleged under GBL §§ 349 or 350 by a claim that a plaintiff paid a premium for a product based on defendants' inaccurate representations." *Ackerman v. Coco-Cola Co.*, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010); *see also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015) (recognizing that in a consumable-goods misrepresentation action, a plaintiff sufficiently alleges injury by asserting they paid a "price premium"); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288-89 (2014) (finding that plaintiffs adequately alleged injury where the class claimed they "would not have purchased, or paid a price premium for" a product if not for the allegedly deceptive advertising). Here, Plaintiffs allege that, but for LMNT's deceptive marketing, they would not have purchased or paid a price premium for LMNT. ¶¶ 12, 14, 52, 83. Plaintiffs specify that "Defendant's decision to "represent[] to consumers that LMNT was a clean, whole-foods electrolyte free from processed food additives," while containing maltodextrin "allowed Defendant to demand a price-premium for LMNT based on attributes the product does not have." ¶ 58. Plaintiffs sufficiently claim that they purchased the Product, "on account of a materially misleading practice," and "did not receive the full value of [their] purchase" because of that materially misleading practice. *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 576-77 (S.D.N.Y. 2021).

Moreover, LMNT's reliance on *Wright v. Publishers Clearing House, Inc.*, 439 F. Supp. 3d. 102 (E.D.N.Y. 2020), is misplaced. Def. Mem. at 21-22. The court in *Wright* found that the caselaw supported a price-premium injury where plaintiffs "(1) directly identified the products at issue and (2) based their allegations on material qualities, such as size or ingredients." *Wright*, 439 F. Supp. 3d. at 114-15 (collecting cases where plaintiffs sufficiently alleged injury based on a

price-premium theory). In such cases, as here, "courts [can] easily infer the loss suffered by the plaintiffs from the absence of those qualities from the purchased products." *Id.* (citing *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 68 (finding a sufficiently pled injury where the plaintiff alleged that "if she had known Defendant's [] claims were false, she would not have paid as much as she did" for a product)). Plaintiffs sufficiently allege an injury here because they "plead something more than the defendant's deception" by asserting that "the price of the product was inflated as a result of defendant's deception." *Preira v. Bancorp Bank*, 885 F. Supp. 2d 672, 676-77 (S.D.N.Y. 2012); *see also Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 481-82 (S.D.N.Y. 2014) (explaining that courts "have found valid [GBL section] 349 claims despite plaintiffs not identifying competitors or prices").

Finally, Plaintiffs sufficiently allege causation. Both Plaintiffs reviewed the product pages on LMNT's website before making a purchase and were exposed to LMNT's marketing claims, including those on the front label of the Product itself. ¶¶ 14-15. These allegations are sufficient to establish causation. *See MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 98 (2d Cir. 2023) (explaining that plaintiff "properly alleged causation because her First Amended Complaint claims that she saw the 'therapeutic-grade' label and the statements made about the individual Products' promised effects before purchasing the Products").

LMNT argues that causation is lacking with respect to one discrete claim on the website— "everything you need and nothing you don't"—because Plaintiffs do not specifically allege viewing that statement. Both Plaintiffs allege, however, that they were exposed to LMNT's claims about the Product on the website, "including" (but not necessarily limited to) those specifically mentioned in the Amended Complaint. ¶ 14 ("Sciortino reviewed Defendant's claims on the website about LMNT, including . . ."); ¶ 15 (While on the Defendant's website, Sawyer saw

24

Defendant's claims about LMNT, including . . ."). Because the "everything you need and nothing you don't" statement appears on the product pages, the Court can infer that Plaintiffs were exposed to the "entire mosaic" of LMNT's marketing claims and that causation is thus satisfied. *Cf. Goldemberg*, 8 F. Supp. 3d at 480 ("Plaintiff describes in particular the allegedly misleading advertising and other statements, then alleges that 'Defendant's false, misleading, and deceptive misrepresentations and omissions, as described herein ... have already deceived and misled Plaintiff....' The reasonable inference to be drawn from these allegations is that Plaintiff saw the Aveeno website and Facebook page described previously in the Complaint, and was thus deceived into purchasing the products in question.") (citation modified).[5]

## VI.    CONCLUSION

This case is not like many consumer-fraud cases filed in this District, where consumers can easily dispel deceptive labeling claims by flipping the package over, and only the named plaintiffs appear to have a genuine stake in the case. LMNT claims its Product is one thing, and the Product is something entirely different—in a way that matters to LMNT's customers. Because Plaintiffs adequately allege that reasonable consumers in the target market were misled, LMNT's motion to dismiss should be denied.[6]

Date: October 14, 2025                         Respectfully submitted,


                                               /s/ *Raphael Janove*
                                               Raphael Janove
                                               **JANOVE PLLC**
                                               500 7th Ave., 8th Floor

---

[5] Plaintiffs withdraw their request for injunctive relief. *See* ¶¶ 42, 47, 49.
[6] Because this motion will be the first adjudication of Plaintiffs' claims on the merits, Plaintiffs respectfully request that, in the event the Court grants LMNT's motion to dismiss in whole or in part, they be given leave to file an amended complaint addressing any deficiencies identified by the Court. *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) ("Without doubt, this circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6).").

New York, NY 10018
Tel: (646) 347-3940
Email: raphael@janove.law

ZIMMERMAN REED LLP
Ryan J. Ellersick (admitted *pro hac vice*)
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel: (877) 500-8780
Email: ryan.ellersick@zimmreed.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(c), I hereby certify that this brief contains 7,933 words, including footnotes but excluding text specified in Rule 7.1(c).

Dated: October 14, 2025

*/s/ Raphael Janove*
Raphael Janove